MICHAEL BAILEY
United States Attorney
District of Arizona
BEVERLY K. ANDERSON
Arizona State Bar No. 010547
NICOLE P. SAVEL
Arizona State Bar No.015958
Assistant United States Attorneys
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone: 520-620-7330
Email:  bev.anderson@usdoj.gov
Email:  nicole.savel@usdoj.gov
Attorneys for Plaintiff

JOHN C. DEMERS
Assistant Attorney General
National Security Division
WILLIAM MACKIE
Trial Attorney
Counterintelligence and Export Control Section
950 Pennsylvania Ave., NW
Washington, DC  20530

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>                  Plaintiff,<br>   vs.<br><br>Wei Sun,<br><br>                  Defendant. | CR 19-00472-TUC-RM (JR)<br><br>GOVERNMENT'S SENTENCING MEMORANDUM |

The United States of America, by and through its undersigned attorneys, hereby respectfully submits this Sentencing Memorandum with regard to the Defendant Wei Sun ("Sun"), to assist the Court in determining the appropriate sentence in this case pursuant to the United States Sentencing Guidelines and Title 18 United States Code, Section 3553.

**Memorandum of Points and Authorities**

**1. Facts**

In December 2018, Wei Sun was employed at Raytheon Missile Systems (RMS) as an Electrical Engineer. On or about December 1, 2018, Sun informed his immediate supervisor of his intention to travel to Singapore and the Philippines later that month for the holiday season. Sun further informed his supervisor that Sun intended to travel overseas with his RMS issued computer laptop. Sun's supervisor knew that Sun was assigned to, and had been working, on a range of RMS projects involving military missile systems and related technical information. For that reason, Sun's supervisor explicitly directed Sun not to take the RMS laptop on any overseas travel as it would violate company policy given that the computer contained military related data and other RMS proprietary information. Moreover, the supervisor told Sun that due to the nature of Sun's work that involved export controlled information, Sun was prohibited under federal law from taking his laptop overseas. Despite these explicit direction and orders, Sun nonetheless intentionally took his RMS laptop computer on his foreign travel.

On approximately January 7, 2019, while in a foreign country, Sun used his RMS laptop computer to access the RMS network and send an email to his supervisor. In this email, Sun stated that he intended to resign from RMS in order to study and work overseas. Upon his return to RMS from China, RMS security officials questioned Sun as to his travel and activities overseas. In response to this questioning, Sun admitted that he had taken his RMS laptop computer with him on his foreign travel, and that it had contained sensitive RMS missile system related information. In statements to the RMS security officials, Sun at first asserted that he had traveled only to Singapore and the Philippines. Upon further questioning relating the details of his travel, however, Sun subsequently admitted that, in fact, he had traveled to China, Cambodia and Hong Kong.[1] Sun explained to the RMS

---

[1] U.S. Customs and Border Protection travel records indicate that Sun departed the U.S. for China on December 18, 2018 and returned from China on January 10, 2019.

security officials that while in China he saw an advertisement for a school relating to a five-month course pertaining to Artificial Intelligence and IoT (Internet of Things); he arranged a visit to that school and ended up spending three days there. Sun also stated that he decided while he was in China to return there in order to pursue further studies. Sun admitted that for the time he was in China, he travelled with and possessed his RMS laptop computer, which at times he left unattended. Further he admitted that he knew that the computer contained RMS project related data (in the form of electronic documents), which he knew were subject to export control laws and regulations.

Following his return to the U.S. and RMS, and subsequent to his interviews with the RMS security officials, RMS fired Sun from employment on January 15, 2019. In discussions with RMS regarding his separation from RMS, Sun had informed RMS officials of his plan to return to China in February 2019. Air travel records indicate that following his termination of employment, on January 16, 2019, Sun changed his travel reservation to move up his departure from the United States to China to January 24, 2019.

Following the filing of a Criminal Complaint and issuance of an arrest warrant, on January 24, 2019, at approximately 6:00 am, Sun was arrested in a hotel lobby as he was departing for the Tucson International Airport in order to make a connecting flight at Los Angeles for travel to China. Sun later acknowledged that his intention was to relocate to China in order to reside, work and enroll in a Chinese university. His arrest was based on the Criminal Complaint alleging the illegal export of a defense article without a license in violation of the Arms Export Control Act, 22 U.S.C. § 2778, and the International Traffic in Arms Regulations (the "ITAR"), 22 C.F.R. Part 120. The nature of the defense article was in the form of technical data contained in his RMS laptop computer that he had taken to China in December 2018 that related to the production of U.S. military missile systems.

Agents from the Federal Bureau of Investigation interviewed Sun on January 24, 2019, shortly after his arrest. In his post-Miranda statement, Sun admitted that he took his RMS issued laptop to China, in addition to his personal laptop and his personal cellphone.

On February 20, 2019, a federal grand jury returned a one-count Indictment against the Defendant, alleging violations of Title 22 United States Code, §§ 2778(b)(2) and 2778(c) and Title 22, Code of Federal Regulations Sections 121.1, 123.1, 125.2 and 127.1. The Indictment was based on the illegal export of a defense article in the form of technical data contained in computer files stored on Sun's RMS computer. (Doc. 19.). On January 29, 2020, a five (5) count First Superseding Indictment was returned against the Defendant, alleging violations of the Arms Export Control Act, that is Title 22 United States Code, §§ 2778(b)(2) and 2778(c) and Title 22, Code of Federal Regulations Sections 121.1, 123.1, 125.2 and 127.1, also with regard to the illegal export of technical data relating to RMS produced missile systems, which constitute defense articles under the ITAR, which had been contained in computer files stored on Sun's RMS laptop computer. (Doc. 48.)

On February 14, 2020, the Defendant entered a plea of guilty to Count One of the First Superseding Indictment relating to the illegal export of an ITAR controlled defense article in the form of technical data contained on Sun's RMS laptop computer that is defined as "File No. 1" in the First Superseding Indictment. Specifically "File No. 1" is an electronically stored document relating to a developmental advance medium range air-to-air missile system (the "AMRAAM" system) titled the "Common Remote Terminal and Navigation FPGA User's Guide" (the "AMRAMM User's Guide").  The U.S. State Department, the relevant federal licensing and regulatory agency, has certified that the technical data contained in File No. 1 constitutes a defense article controlled pursuant to the ITAR.  The AMRAMM User's Guide had been specifically labeled by RMS as ITAR controlled; and the Defendant has acknowledged in his Plea Agreement and in Court proceedings that he knew the technical data in File No. 1 was ITAR controlled.  This Court is scheduled to sentence the Defendant in the case on November 4, 2020.

On May 11, 2020, the United States Probation Officer assigned to this case submitted a Presentence Investigation Report (PSR) to the Court outlining the offense conduct and recommending that the USSG Base Offense Level be calculated at a Chapter Two, § 2M5.2(a)(2), Offense Level 26 with no adjustments for Specific Offense

Characteristics. Further, that in view of the Defendant's plea of guilty in advance of trial that the Court should reduce the Base Offense Level of 26 by three Offense Levels pursuant to USSG § 3E1.1(a) & (b). Accordingly, the PSR recommendation of a Total Offense Level 23, Criminal History Category I, translates into a recommended sentencing range for imprisonment of 46-57 months, and a criminal fine range from $20,000 to $1,000,000 pursuant to U.S.S.S. § 5E1.2(c)(4). The United States concurs with the PSR recommendation as to the application of U.S.S.G. § 2M5.2(a)(1) with a 46 month sentence, and the application of § 5E1.2(c)(4) as to the range for a criminal fine. The United States adopts the Probation Officer's statement of the case status, history, factual basis for the plea and Sentencing Guidelines analysis and calculation of the Court's options for sentencing of the Defendant pursuant to the advisory Sentencing Guidelines.

The United States agrees that the USSG sentencing range as currently recommended in the PSR would result in a Total Offense Level 23 and a sentencing range of 46-57 months. Moreover, for the reasons stated herein, the United States submits that a sentence within this recommended Guideline range is both appropriate and consistent with the applicable sentencing factors the Court should consider under 18 U.S.C. § 3553(a). Accordingly, the United States respectfully urges the Court to sentence the defendant within this recommended Guideline range as such a sentence is (i) warranted under the applicable statutory provisions as more fully discussed herein, (ii) appropriate under the specific facts of this case and (iii) in the interests of both justice and the public. For those reasons, the government submits that the Court should adopt as the starting point the Guidelines range as determined by the Court and, based upon all the factors enumerated in 18 U.S.C. §3553, impose a sentence within this advisory Sentencing Guideline range.

## 2. **Legal Standard**

Any sentence properly imposed by the Court within the sentencing guideline range as calculated under the U. S. Sentencing Guidelines will be considered presumptively reasonable by a reviewing court even though the sentencing guidelines are only advisory. *United States v. Rita*, 551 U.S. 338 (2007). Pursuant to *Rita*, a sentence properly calculated

within the federal Sentencing Guideline bears a rebuttal presumption of reasonableness, given that after *Booker* a trial court nonetheless must consider the applicable Guideline range together with other statutory factors under Section 3553(a) and Guideline sentence carries a presumption of reasonableness.  A sentence within the federal Sentencing Guideline range, while not by that fact alone "per se reasonable," carries a presumption of reasonableness and will be upheld on appeal when the record demonstrates that the sentencing court carefully considered the sentencing range as applied to the particular defendant in light of the factors outlined in 18 U.S.C. §3553(a).  The Supreme Court has directed federal trial courts to initially calculate the appropriate Guideline Sentencing range under the advisory Sentencing Guidelines. *Gall v. United States*, 552 U.S. 38, 41 (2007).

Accordingly, a sentencing court should impose a sentence within the applicable Guideline range "unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission."  *United States v. Reed*, 264 F.3d 640, 646 (6th Cir. 2001)(quoting 18 U.S.C. § 3553(b)).  The First Circuit noted "the guidelines are the starting point for the fashioning of an individualized sentence, so a major deviation from them must 'be supported by a more significant justification than a minor one.'" *United States v. Martin*, 520 F.3d 87, 91 (1st Cir. 2008) (quoting *Gall*, 552 U.S. at 50).

Thus, the starting point here is the Guideline Sentencing range specified above: at Adjusted Offense Level 23 and criminal history category I, 46-57 months of imprisonment. The United States' recommendation of 46 months – at the low end of that range – is sufficient but not greater than necessary to comply with the purposes of sentencing.

There are no reasons to move off this starting point, as Defendant would have the Court do. This was no mere technical violation of some arcane export control regulation. This case involves the intentional, willful violation of the ITAR by taking advanced air-to-air missile design technical data out of the country, and, specifically to China, which at least in terms of political and military concerns is a hostile foreign power.  This type of conduct represents a significant breach of national security by exposing AMRAMM

technology to disclosure and extraction, even if the Defendant had not considered this risk, or now argues that there is no affirmative evidence the technical data was compromised.

Accordingly, in determining whether a particular circumstance has been adequately considered by the Guidelines, the Court should consider only the Guidelines, policy statements, and official commentary of the Guidelines. *Rita,* at p*. 352 (*the Sixth Amendment doesn't prohibit the sentencing court from taking account of Sentencing Commission's factual findings and recommended sentences*); United States v. Martin*, 520 F3d at 91.  To determine whether a departure is permissible, the Court must consider whether the circumstances are so unusual that the case is "outside the heartland" of similar cases under the Guidelines.  *Id*.  The Court's sentencing discretion is governed by statute and the Guidelines, and the Court may not simply ignore that analysis.  *United States v. Saucedo*, 226 F.3d 782, 791-92 (6th Cir. 2000) (district court erred in not considering whether case outside "heartland" before departing).  The defendant has the burden of persuading the sentencing court that the departure is warranted.  *United States v. Rutana*, 932 F.2d 1155, 1159 (6th Cir. 1991) (sentence of probation was error where the court departed twelve levels based upon improper factors of economic effect of incarceration on defendant's business and the court's opinion that minimum fine under guidelines was "harsh").

With regard to the sentencing factors outlined in 18 U.S. C. §3553(a), the United States submits that a sentence of 46 months, which falls at the low end of the recommended USSG sentencing range of 46 to 57 months, is appropriate and justified under the facts of this case.  As discussed below, such a sentence would be warranted in light of the nature and circumstances of the offense involving a violation of the Arms Export Control Act (AECA); the need to impose a sentence that reflects the seriousness of AECA offenses; the need to promote respect for arms export control laws and to prevent the proliferation of arms related trafficking (including technical information, or "data," as defined under the ITAR); the need to provide for just punishment for the risk this offense posed to national security; and the need to afford adequate deterrence to similar future criminal conduct.

### 3. The Sentencing Factors warrant a sentence within the guidelines

#### a. The Nature, Circumstances, and the Seriousness of the offense

The Defendant's actions in 2018, as admitted by him in the Plea Agreement and outlined in the PSR, represented a knowing and intentional course of conduct that was, in fact, in violation of federal law (specifically the AECA and the ITAR).  The Defendant decided to act in clear disregard of both federal law and defined RMS policy, which had been instituted to safeguard against just such ITAR violations and to protect RMS proprietary information.  The Defendant had been trained in this regard and, moreover, had been explicitly warned immediately before his trip to China not to transport export controlled materials outside the United States, whatever the foreign destination.  The Defendant's actions reflect defiance, not ignorance, of what he knew was the controlling law and policy prohibiting the transport – or export – of ITAR controlled technical data out of the United States without the necessary license from the U.S. government.

The Defendant recently attempted to call into question whether a modification to the Code of Federal Regulations (22 CFR §126.54) that came into effect in 2019 somehow applies now to his conduct with regard to the definition of "export."  Any such argument or claim is clearly misdirected given that (i) the fact that the modification at issue does not apply to the Defendant's conduct and (ii) moreover, was not even in effect at the time of his illegal export in December 2018.  In addition, in terms of his "knowing and willful violation of the law," the Defendant never raised this issue of the after-effect CFR modification as a good faith basis for his actions in any interviews, either first with RMS security officials or later with law enforcement agents, or with the Court at the time he entered a plea of guilty. *See* Defendant's Sentencing Memorandum, pp. 10-12 (Doc. 82).

The Court should consider this factor, the nature and circumstances of the offense, in light of the central issue in this case, namely the significant threat to national security that was presented by the Defendant's actions in illegally exporting military technical data relating to the operation of the AMRAAM system to the PRC.  The significance of this threat was compounded by the fact that the technical data contained in File No. 1 related

not only to a currently operating missile system, but also included aspects that are still under development. The essence of the export control regime governed by the ITAR is to limit the threat of the effect of disclosure of sensitive military information to hostile foreign powers. Such a threat includes the significant risk of the development of countermeasures to defeat the U.S. missile systems and the advance of the development of similar missile systems by hostile foreign powers. The technical data included in File No. 1 encompasses information that has been developed and tested over the course of decades.

The government has provided notice that it intends to call a RMS missile system engineer as a witness at the sentencing hearing to testify regarding the importance and significance of the AMRAAM weapons system in general, and specifically as to the significant value of the technical information that is contained in File No. 1. Further, that this technical data is considered ITAR controlled, closely protected non-publically available information, and the disclosure of which could present a major threat to the integrity of this military missile system.

Consequently, the Defendant's actions taken internationally in systematically undermining and evading the existing laws, regulations and policies regarding export control that are designed and intended to prevent the proliferation of arms technology and related information posed a very real risk and threat to existing efforts to safeguard national defense security information. It is well documented in public literature that the PRC government and military have undertaken a concerted effort to bridge the gap in technology and technological information that currently exists between the PRC and this nation. China has grown more aggressive in its efforts to acquire American technology to achieve strategic military advantages, and in response, the United States has made countering Chinese national security threats a strategic priority. *See, e.g.*, "Department of Justice's Attorney General China Initiative Fact Sheet," *available at* https://www.justice.gov/opa/press-release/file/1179321/download; *Director Addresses Council on Foreign Relations*, Apr. 26, 2019, *available at* https://www.fbi.gov/news/stories/director-address-council-on-foreign-relations-042619.

Also see *The Cox Report: U.S. National Security and Military/Commercial Concerns with the Peoples Republic of China*, Report of the Select Committee, United States House of Representatives (Washington, DC: Regnery Publishing, Inc. 1999), pp. 68-70.

### b.  The Need to Promote Respect for the Law

Enforcement of and compliance with arms export control regulations are critical to protecting national security and, more importantly, preventing the proliferation of arms technology throughout the world.  The significance of this case is found in the principle that defense contractors, which are an essential component of the U.S. military weapons development system, and most importantly all individuals associated with such entities, have a duty to uphold and abide by these laws and regulations.  If any of these parties, let alone the general public, begins to perceive there is a lack of enforcement or punishment for violations, it will not be long before effective enforcement of the AECA and the ITAR is greatly diminished and degraded.  In that respect, a below Guidelines sentence that is not related to a specific, unusual mitigating factor or fact unique to this case might diminish, rather than promote, respect for the enforcement of the AECA and the ITAR.  Such a lesser sentence could have an adverse effect on efforts to prevent the proliferation of weapons and weapons related information.

### c.  Just Punishment for the Offense

The very nature of the laws and regulations embodied in the AECA and the ITAR are designed to prevent the dissemination and transfer of weapons and associated information and technology.  In that sense, these laws and regulations are designed and intended to act as a preventive means, a prophylactic measure, to stem the spread of arms proliferation and trafficking. If sufficient punishment is not provided for violations of these laws, the AECA and the ITAR will have limited effect.

The Defendant argues that "merely transporting" technical data to a foreign nation, such as PRC, didn't by itself cause any harm.  In that light, the Defendant argues that a Guidelines sentence would be in excess of what is needed for a "just punishment."  This argument, however, ignores the fact that it is the risk of harmful disclosure inherent in

transporting export controlled military missile information to a foreign nation that constitutes the harm to the public. Once such technical data (or any form of a defense article) is "exported" then such information (or physical item) is open for compromise in the form of disclosure or copying (whether known or not to the Defendant), all to the possible detriment of the nation. Further, given that the technical data as charged was stored in the Defendant's computer only raises the possibility that, even unbeknownst to the Defendant, a third party could have fully imaged the computer and copied all the materials without leaving a computer forensic trace. Stated differently, Sun's computer could have been mirror imaged by a third party, and there would be no forensic trace or evidence that this took place. (See Attachment 1, Affidavit of Alan Vanderploeg, FBI Special Agent/Forensic Examiner).[2] Defendant completely ignores this possibility. This is the reason that the Defendant was required under the ITAR to obtain an export license prior to transporting – exporting – the ITAR controlled technical data to China.

The Defendant chose to directly ignore orders not to take the RMS export controlled data out of the country, and by doing so acted to evade and defeat these laws. It does not mitigate the seriousness of his violation that he now claims that at that time he didn't fully appreciate or foresee the possible scope of harm involved in transporting the technical data to the PRC.

Therein lies the crux of this case and for the need to provide a just punishment: the defendant caused, at the very least, a serious risk of harm to national security by taking upon himself to decide whether or not to take ITAR controlled technical data to the PRC. The very real risk of harm to the national defense occurs and continues to exist once that technical data "cat is out of the bag," or the computer lap top is transported to and located (at times unattended) in China. The evidence is clear, and the Defendant has admitted, that even when directly informed, instructed and ordered by RMS officials not to transport the

---

[2] Also see argument at Section 4 in response to Defendant's request for a downward departure.

RMS information to the PRC, the Defendant defied that directive and did that which he was told not to do. With the Defendant's position as a RMS engineer possibly known to his contacts in China, the risk of exposure while in China of the RMS AMRAAM system information (in the form of the File No.1 technical data) to PRC officials is not theoretical, but very real. Such a clear disregard of the law that resulted in a risk to defense information merits the just punishment of a Guidelines sentence.

          d.  <u>Adequate Deterrence and Non-Disparate Sentences for Similar Conduct</u>

In a world where advanced technology and technological information controls much of the battlefield and can have a significant effect on national security, it is paramount that there exists adequate deterrence to the very conduct embodied in the nature of what the Defendant did in this case. It is well documented that foreign nations and non-governmental actors are actively seeking to obtain U.S. origin confidential, restricted and export controlled information as a means to close the technology and information gap that currently exists, especially with regard to hostile foreign powers.

With respect to deterrence, the Court should consider both the specific deterrence of this Defendant and the general deterrence of others who might consider committing similar crimes involving export control laws. *See, e.g.*, *United States v. Onuoha*, 820 F.3d 1049, 1057 (9th Cir. 2016) ("[G]eneral deterrence for the benefit of society is served when a person is convicted of a serious crime, thus deterring others from making the same mistake"); *United States v. Yu*, 770 F. App'x 813, 814 (9th Cir. 2019).

The Court should avoid unwarranted sentencing disparities by imposing a term of imprisonment that is in line with the following sentences imposed upon similarly-situated defendants:

In *United States v. McKeeve*, 131 F.3d 1 (1st Cir. 1997), the court upheld a 51-month sentence after a jury verdict for exporting computer products to Libya in violation of the Libyan trade embargo.

In *United States v. Wang-Woodford*, 03-CR-70 (E.D.N.Y.), the defendant pleaded

guilty to one count of conspiring to violate the International Economic Emergency Act ("IEEPA") for her involvement in shipping aircraft component parts to Iran through third countries and was sentenced to 46 months of imprisonment, which was the upper range of the stipulated 37 to 46-month range contained in the Plea Agreement.

In a 2018 Central District of California case, *United States v. Chen*, Case No. 17-CR-00254-CJC (C.D. Cal.), the court sentenced the defendant Chinese national and resident of California to 46 months in prison for conspiring to illegally export sensitive space communications technology to China. For two years, the defendant engaged in the procurement of sensitive U.S. technology and parts with applications in radar, military jammers, and space communications for illegal export to Hong Kong and China. (Docket, Case No. 17-CR-00254-CJC (C.D. Cal.) (Doc. 50). With the applicable Guideline range of 46-57 months (identical to the Defendant), the *Chen* defendant requested a downward variance to a time-served sentence of approximately 18 months; the court sentenced the defendant to a within-Guidelines sentence of 46 months. (Doc. 57, at 3; Doc. 58.)

In another Central District of California case, *United States v. Su Bin*, Case No. 14-CR-00131-CAS (C.D. Cal.), the court imposed a 46 month sentence of imprisonment on the defendant Chinese national, and resident of Canada, who had conspired to hack into the computer networks of multiple U.S. defense contractors, steal sensitive military technical data, and thereafter export that technical data (similar to this Defendant) from the United States to China without an export license. (Docket, Case No. 14-CR-00131-CAS (C.D. Cal.) (Docs. 58, 64).

In 2016, a court in the Eastern District of Kentucky sentenced a U.S. citizen 93 months in prison for conspiring to illegally exporting microcircuits classified as defense articles from the United States to China in violation of the ITAR (similar to this Defendant). *See United States v. Brothers*, Case No. 14-35-ART/CJS (E.D. Ky.) (Docs. 49, 75).

In *United States v. Amirnazi*, 08-CR-429 (E.D. Pa.), the defendant was convicted

after trial for conspiring to violate IEEPA, and a substantive count of violating IEEPA for providing database and software services to Iranian companies, and sentenced to 48 months of imprisonment.

In *United States v. Todd*, 10-CR-58 (M.D. Ga.), the defendant pleaded guilty to one count of conspiring under 18 U.S.C. § 371 to violate the Arms Export Control Act and IEEPA for exporting military aircraft equipment to Iran and was sentenced to 35 months' incarceration and a $10,000 fine. That 35-month sentence took into account the defendant's substantial assistance in the lure and arrest of a co-defendant. Todd's co-defendant, who also assisted in the lure and arrest of an Iranian procurement agent, was sentenced to 56 months of imprisonment (*United States v. Seifi*, 10-CR-58 (M.D. Ga.)).

Other cases involving ITAR violations have included *U.S. v. Michael Ryan* (D. Kan, 2017) 52 months for the illegal export of weapons); *U.S. v. Pheerayuth Burden* (D.DC, 2017) (55 months for the illegal export of gun parts); *U.S. v. Michael Franklin* (SDFL, 2017) (48 months for the illegal export of gun parts); *U.S. v. John Roberts* (MDTN, 2017) (180 months for the illegal export of U.S. army weapons); *U.S. v. Alexander Posobiloz* (EDNY, 2018) (135 months for the illegal export of weapon technology); and *U.S. v. Eldar Resvanov* (EDVA, 2018) (46 months for the illegal export of weapon parts).

Earlier cases also reflect sentences that fall within the Guidelines.  In December 2007, a defendant was sentenced to 48 months imprisonment after pleading guilty to the theft of defense articles (including night vision goggles) and illegal export of these items. *U.S. v. Jerri C. Stringer*, Case No. 3:07:-cr-90-LC (NDFL).  In September 2008, three defendants were sentenced to imprisonment ranging from 30 months to 46 months for exporting defense articles (ammunition) in violation of the AECA. *U.S. v. Munoz-Mendez, et al.*, Case No. 7:07-cr-01041 (SDTX).  In a significant case involving the illegal export of defense information to the PRC with regard to U.S. naval warship technology, the defendant Tai Mak was sentenced pursuant to a plea agreement to 120 months' imprisonment for a conspiracy to export defense articles; a co-conspirator, Chi Mak a 65 year old former engineer with a U.S. Navy contractor was sentenced to 293 months for a

conspiracy to export U.S. naval technology to the PRC. *United States v. Chi Mak, et al.,* Case No. 8:05-cr-293-CJC (SDCA). It should be noted that significant factor was that both defendants were also convicted as acting as unregistered agents of a foreign power.

This sampling of recent and older convictions and sentences in AECA related cases underscores the importance of dealing with various efforts by different defendants to breach the wall of export control, or otherwise expose this country to the risk of the proliferation of defense articles and information.

The Defendant has cited in support of his argument for a time served sentence a recent Massachusetts case involving the illegal retention domestically of lower level classified materials (as in less than Top Secret), specifically *U.S. v. Serageldin*, Case No. 1:18-cr-10436-PBS. Defendant's Sentencing Memorandum, p. 9 (Doc. 82). Apart from the fact that this case involving an entirely different type of offense, and one that did not involve the illegal export of military technical data to a foreign nation, the Defendant's argument for a lesser than Guidelines sentence is misplaced and relies on a very different set of facts. A simple review of that case indicates that the Court in evaluating an appropriate sentence for this Defendant took into consideration, among several factors, that Defendant was elderly (67 years old), had diabetes, hypertension, and asthma, all of which led the Defendant to argue that imprisonment would translate into very serious health risks relating to the ongoing COVID-19 pandemic. The government had argued for Guideline range sentence of 60 months, and the defendant had argued for a probationary sentence.

In the perspective of this case, however, a Guidelines sentence should not be considered an aberration or extreme, but a just and fair sentence for the nature of the crime. While the export of just one weapon in a physical form certainly represents a definite threat to national security (e.g., allowing reverse engineering), the export of technological information, as in technical data, represents a far greater threat of weapons proliferation.

**3. Defendant's stated reason for taking his RMS laptop to China is illogical.**

In his Sentencing Memorandum, Defendant claims he took his RMS issued laptop on his personal vacation "to search for hotel rooms and to send an email on his RMS

1  account to his supervisor stating that he would be resigning from RMS to study and work
2  overseas." (Doc. 82; 4.)   This argument is disingenuous.  On January 24, 2019, Defendant
3  admitted to FBI agents that he took his RMS issued laptop with him, *in addition to his*
4  *personal laptop and his personal cellphone.*  Defendant could have easily used his personal
5  laptop or his personal phone to search for hotel rooms and to send his supervisor an email
6  advising that he was resigning from RMS.  Instead Defendant chose to take his RMS issued
7  laptop containing sensitive military information on his vacation while he searched for a
8  job.  Defendant's claim in his Sentencing Memorandum is misleading and incorrect.

**4.  Defendant's downward departure request for "lack of risk" is misplaced.**

Finally, Defendant seeks a downward departure because, "the lack of any transmission of data is a factor that the court should consider to determine whether a downward variance by the Court is warranted under USSG 2M5.2.  The base offense level assumes that the offense conduct was harmful or had the potential to be harmful to a security or foreign policy interest." (Doc. 82; 7.)  Defendant completely ignores the fact that the government has repeatedly presented evidence that it's possible the ITAR protected military information *was compromised* unbeknownst to him without leaving a trace.

**5.  Conclusion.**

For the above stated reasons, the United States respectfully requests this Court impose a sentence of 46 months.

Respectfully submitted this 27th day of October 2020.

                          MICHAEL BAILEY
                          United States Attorney
                          District of Arizona

                          *s/Beverly K. Anderson*

                          BEVERLY K. ANDERSON
                          Assistant U.S. Attorney

Copy of the foregoing served electronically or by
other means this 27th day of October 2020 to:

Cameron Morgan, counsel for Defendant Sun